**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::
MICHAEL SHAW,

        Petitioner,

  v.                                           **9:03-CV-0610**
                                                     **(NPM)**

**SUPERINTENDENT, Attica Correctional Facility,**

        Respondent.
::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::
**APPEARANCES:**                 **OF COUNSEL:**

**FOR THE PETITIONER:**

**MICHAEL SHAW**
Petitioner, <u>pro se</u>
99-B-0810
Great Meadow Correctional Facility
P.O. Box 51
Comstock, NY 12821

**FOR THE RESPONDENT:**

**HON. ANDREW CUOMO**      **PATRICK F. MACRAE, Esq.**
New York State Attorney General    Assistant Att'y General
615 Erie Boulevard West
Suite 102
Syracuse, NY 13204

**NEAL P. MCCURN**
**SENIOR UNITED STATES DISTRICT JUDGE**

<u>**MEMORANDUM-DECISION and ORDER**</u>

**I.**    <u>**Background**</u>

      **A.**    <u>**State Court Proceedings**</u>

      According to the testimony adduced at trial, on May 15, 1998, Donovan "Romeo"

Allen, lived on East Fayette Street in the City of Syracuse, New York.  <u>See</u> Transcript of Trial

of Michael Shaw (2/23/99) ("Trial Tr.") at 575.  Allen had been involved in an ongoing dispute

with Michael "Lucky" Johnson and his friends, including petitioner, pro se, Michael "Gem Star" Shaw. Trial Tr. at 578-579, 697-700. Specifically, the records reflect that several months before May, 1998, Allen had hit Johnson's car, Trial Tr. at 759, and the two had been involved in both verbal arguments and fist fights. Trial Tr. at 784-785.

Between 2:30 and 3:30 in the afternoon of May 15, 1998, Johnson, his girlfriend Sayeeda and Shaw drove to Allen's home. Trial Tr. at 693-695. At the time, people were sitting outside of that house, however Allen himself was not at home. Trial Tr. at 577. Johnson, Sayeeda and Shaw exited their vehicle and Johnson began talking with an individual who was standing in front of Allen's house. Trial Tr. at 579, 698. Their conversation ended when Orville "Sardine" Miller came out of Allen's house brandishing a knife and approached the group. Trial Tr. at 579, 698-700, 901. Miller and Shaw soon "exchanged words" and then "went to go fight." Trial Tr. at 701. At some point during that altercation, Miller discarded his knife and pulled a gun out from his back pocket. Trial Tr. at 582, 702. Miller's actions prompted Shaw to exclaim "this is the second or third time you pull a gun on me. I'll be back." Trial Tr. at 582, 705. Miller then put the gun back in his pocket and walked away. Trial Tr. at 704.

Shaw, Johnson and Sayeeda then left the area and met Omar Lutehman, a friend of both Shaw and Johnson. Trial Tr. at 582, 705-08. After a brief meeting, Lutehman entered his car and drove to the Western Lights area of Syracuse with Shaw, Johnson and Sayeeda following in their automobile. Trial Tr. at 708-10. Lutehman and Shaw then briefly entered a house together, after which they both entered Johnson's car and drove towards East Fayette Street. Trial Tr. at 711-713. After dropping Shaw off, Johnson parked his car and he, Lutehman and Sayeeda began walking towards Allen's home. Trial Tr. at 713.

2

Allen, who had returned to his home approximately fifteen minutes after the fight between Shaw and Miller had ended (Trial Tr. at 585), soon noticed Sayeeda, Johnson and Lutehman walking toward his house.  Trial Tr. at 588-589, 714-715, 902-905.  When Johnson and Allen met, the two began fighting.  Trial Tr. at 537, 590, 716.

Around that time, Shaw was observed walking up East Fayette Street with a long, black gun at his side.  Trial Tr. at 598-99, 717-718, 905-907.  Around that time, Sayeeda apparently said something to Allen which prompted him to call her a "bitch."  Trial Tr. at 592-93, 905.  Johnson responded by moving toward Allen, who then brandished a knife.  Trial Tr. at 592-93.  Johnson turned and ran away, however Allen chased after him.  Trial Tr. at 594, 716-717.  Shaw then started shooting the gun he was carrying at Allen.  Trial Tr. at 599-601, 718-19, 842-843, 849, 905-907.[1]  After the shooting, Lutehman, Johnson and Sayeeda entered their car and drove away, however the trio soon returned to pick up Shaw.  Trial Tr. at 719-20.  At that time, Shaw informed Johnson that he had shot Allen.  Trial Tr. at 722.

The trial transcript also reflects that at approximately 4:19 p.m. on May 15, 1998, Syracuse Police Officer Ronald Brico was dispatched to the 1400 block of East Fayette Street in the City of Syracuse on a call that "started out with a man with a gun and it was updated to a shots fired and ultimately a man down."  Trial Tr. at 510.  Upon arriving at the scene, Officer Brico observed an individual later identified as Allen lying in the driveway of a residence bleeding profusely from his left side.  Trial Tr. at 511-12.  Allen was transported to Upstate Medical Center where he was pronounced dead at 4:46 p.m. on May 15, 1998, never having

---

[1]        Witnesses heard multiple, rapid shots being fired at the time.  Trial Tr. at 540, 594, 718, 843, 905-09.

regained consciousness after the shooting.  Trial Tr. at 512-513.[2]

        As a result of the foregoing, on July 15, 1998, an Onondaga County grand jury returned

an indictment against Shaw.  See Indictment No. 98-0573-1 ("Indictment").  In that accusatory

instrument, Shaw was charged with murder in the second degree, in violation of N.Y. Penal L.

§ 125.25(1), criminal possession of a weapon in the second and third degrees, contrary to N.Y.

Penal L. §§ 265.02(1) and 265.03, and first degree reckless endangerment, in violation of N.Y.

Penal L. § 120.25.  See Indictment.  Beginning on February 23, 1999, Shaw was tried before a

jury on the foregoing charges in Onondaga County Court with County Court Judge J. Kevin

Mulroy presiding.  At the close of the prosecution's case-in-chief, Shaw's counsel moved to

dismiss all counts in the Indictment based upon his claim that the prosecution had failed to

meet its burden of proof as to each of the above-described charges.  Trial Tr. at 1037.  Judge

Mulroy dismissed the charge of criminal possession of a weapon in the third degree after he

determined that it was duplicitous of the other weapons possession charge brought against

Shaw, however the County Court denied counsel's motion to dismiss the Indictment in all other

respects.  See Trial Tr. at 1038.

        Following the arguments of counsel and the trial court's instructions, the jury began its

deliberations.  Trial Tr. at 1198.  During the course of those deliberations, Judge Mulroy

responded to several requests of the jury, which included a request that the testimony of a

prosecution witness, Everod Reid, be read back to the jury.  Trial Tr. at 1201-06.  The jury

---

        [2]        An autopsy performed on Allen's body revealed that he had sustained "a
number of gunshot wound injuries," one of which hit his right lung, traversed through his
heart, went through his left lung and exited the left side of his body.  See Trial Tr. at 877.
Allen's death was caused by multiple gunshot wounds.  Trial Tr. at 890.

thereafter returned a unanimous verdict in which it found Shaw guilty of the second degree

murder, criminal possession of a weapon and reckless endangerment charges.  Trial Tr. at

1207-09.

On April 16, 1999, Shaw appeared before Judge Mulroy for sentencing on the above

convictions.  At that proceeding, the County Court sentenced Shaw to a term of twenty-five

years to life imprisonment on the murder conviction, and lesser, concurrent terms on the

remaining convictions.  See Transcript of Sentencing of Michael Shaw (4/16/99) at 12-13.

Shaw appealed his convictions to the New York State Supreme Court, Appellate

Division, Fourth Department, which appeal was opposed by the Onondaga County district

attorney.  On November 13, 2000, the Appellate Division denied Shaw's appeal in all respects.

See People v. Shaw, 277 A.D.2d 1052 (4th Dept. 2000).  On April 6, 2001, the Court of

Appeals denied Shaw's application for leave to appeal to that court.  See People v. Shaw, 96

N.Y.2d 806 (2001).

On November 27, 2001, Shaw filed a collateral challenge to his state court conviction in

the form of an application for a writ of error coram nobis filed with the Appellate Division.

See State Court Record ("Record") at 1732-95 ("Coram Nobis Application").  In that

application, Shaw alleged several theories in support of his claim that his appellate counsel

rendered ineffective assistance.  See Coram Nobis Application.  That application was opposed

by the district attorney, and on March 11, 2002, the Appellate Division denied Shaw's coram

nobis request in all respects.  See People v. Shaw, 292 A.D.2d 881 (4th Dept. 2002).

On April 2, 2002, Shaw filed a motion to vacate his judgment of conviction pursuant to

Section 440.10 of New York's Criminal Procedure Law ("CPL") with the County Court.  See

Record at 1800-46.  Later that same month, Shaw filed a second CPL Motion with that court.

See Record at 1856-79.  The district attorney opposed those applications, see Record at 1880,

1883-84, and on July 22, 2002, Onondaga County Court Judge William D. Walsh denied

Shaw's motions to vacate.  See People v. Shaw, No. 98-573-1 (Onon.Cty.Ct. July 22, 2002)

(Record at 1881-82) ("July, 2002 Order").  In its order dated February 27, 2003, the Appellate

Division denied Shaw's application for leave to appeal that decision of the County Court to the

Appellate Division.  See People v. Shaw, No. KA 02-02099 (4th Dept. Feb. 27, 2003) (Record

at 1885).

### B. Proceedings in This Court

Petitioner commenced this proceeding, pro se, on May 3, 2003.  See Petition (Dkt. No.

1) at 7.[3]  Now-Chief United States District Judge Norman A. Mordue thereafter directed Shaw

to file an amended petition in this action (Dkt. No. 3), and on August 14, 2003, Shaw filed an

amended petition herein.  Dkt. No. 5.  Shaw thereafter requested permission to file another

amended pleading in this action (Dkt. No. 19), and on April 20, 2004, Magistrate Judge David

E. Peebles granted that application.  See Dkt. No. 21.  Shaw thereafter filed such pleading in

---

[3]     Although Shaw's petition was file-stamped by the clerk on May 19, 2003, the
Second Circuit has held that due to the unique difficulties faced by incarcerated pro se
litigants, a prisoner's pleading is deemed to be properly filed at the time he hands the papers
to the prison authorities for transmittal to the court.  Dory v. Ryan, 999 F.2d 679, 681-82 (2d
Cir), modified on reh'g, 25 F.3d 81 (2d Cir. 1994); Noble v. Kelly, 246 F.3d 93, 97-98 (2d
Cir. 2001) (extending "prison mailbox rule" to petitions seeking writ of habeas corpus
pursuant to 28 U.S.C. § 2254).  Shaw dated his petition on May 3, 2003.  See Petition (Dkt.
No. 1) at 7.  Therefore, applying the prison mailbox rule, the undersigned finds that Shaw
should be deemed to have commenced this proceeding on May 3, 2003.

which he alleges that:  i) he received the ineffective assistance of appellate counsel; ii) the

prosecutor engaged in misconduct when he called a "false witness" to testify at Shaw's trial;

iii) he was deprived of his right to a fair trial by the County Court; and iv) he received the

ineffective assistance of trial counsel.  See Dkt. No. 23 ("Am. Pet.").  The respondent was

afforded until July 30, 2004 to file his response to the amended pleading, see Dkt. No. 25, and

on that day, the Office of the Attorney General for the State of New York, acting on

respondent's behalf, filed an answer together with a memorandum of law in opposition to

Shaw's amended petition.  Dkt. No. 26.[4]  Petitioner thereafter submitted a traverse in further

support of his habeas application.  See Dkt. No. 27.

On January 5, 2006, then-Chief United States District Judge Frederick J. Scullin, Jr. re-

assigned this action to the undersigned for disposition.  See Dkt. No. 29.

## II.   Discussion

### A.   Timeliness of Petition

Respondent initially claims that this action was not timely commenced by Shaw in light

of the one year statute of limitations applicable to habeas corpus petitions as a result of the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  See Resp. Mem. at 11-12;

see also 28 U.S.C. § 2244(d).

On October 17, 2003, United States District Judge Norman A. Mordue, who at the time

was the assigned District Judge relating to this action, entered an order that specifically

---

[4]      Respondent's memorandum of law in opposition to the amended petition
("Resp. Mem.") has been docketed as an attachment to his answer to that pleading.  See Dkt.
No. 26.

addressed the issue of the timeliness of Shaw's action.  See Dkt. No. 8 ("October, 2003

Order").  In that order, Judge Mordue provided a detailed analysis relating to the state court

actions filed by Shaw and the effect that those proceedings had on tolling the AEDPA's statute

of limitations.  See October, 2003 Order at 1-3.[5]  Judge Mordue ultimately concluded that "it

appears as though Petitioner has timely filed his original Petition for purposes of the AEDPA."

See October, 2003 Order at 3.

Under the doctrine of the law of the case, "'when a court decides upon a rule of law,

that decision should continue to govern the same issues in subsequent stages of the same

case.'"  Small v. Arch Capital Group, Ltd., No. 03 CIV. 5604, 2005 WL 2584158, at *2

(S.D.N.Y. Oct. 12, 2005) (quoting Arizona v. California, 460 U.S. 605, 618 (1982)).

Nothing in the record suggests that Judge Mordue's determination that this action was

timely commenced by Shaw is erroneous in any way.[6]  Therefore, under the doctrine of law of

the case, this Court denies respondent's request to dismiss this action as untimely filed, and

accordingly next considers the standard of review that is to be employed in considering

petitioner's claims.

**B.**     **Standard of Review Applicable to Shaw's Claims**

---

[5]     The AEDPA provides that "[t]he time during which a properly filed
application for State post-conviction or other collateral review ... is pending shall not be
counted toward any period of limitation under this subsection."  28 U.S.C. § 2244(d)(2).

[6]     Respondent's argument that this action is time-barred appears to be based
upon the erroneous assumption that Shaw's conviction became final on July 5, 2000.  See
Resp. Mem. at 11.  However, New York's Court of Appeals did not deny Shaw's
application for leave to appeal the Appellate Division's decision until approximately nine
months **after** that date, i.e., on April 6, 2001.  See People v. Shaw, 96 N.Y.2d at 806.

Under the AEDPA:

> a federal court may award habeas corpus relief with respect to a
> claim adjudicated on the merits in state court only if the
> adjudication resulted in an outcome that: (1) was "contrary to, or
> involved an unreasonable application of, clearly established
> Federal law, as determined by the Supreme Court of the United
> States"; or (2) was "based on an unreasonable determination of
> the facts in light of the evidence presented in the State court
> proceeding."

Rodriguez v. Miller, 439 F.3d 68, 73 (2d Cir. 2006) (quoting 28 U.S.C. § 2254(d)); see also

DeBerry v. Portuondo, 403 F.3d 57, 66 (2d Cir. 2005); Miranda v. Bennett, 322 F.3d 171, 177-

78 (2d Cir. 2003).  "A state court adjudication is 'contrary to' clearly established federal law

only if 'the state court arrives at a conclusion opposite to that reached by [the Supreme] Court

on a question of law or if the state court decides a case differently than [the Supreme] Court has

on a set of materially indistinguishable facts.'"  Rodriguez, 439 F.3d at 73 (quoting Williams v.

Taylor, 529 U.S. 362, 413 (2000)).  Under the "unreasonable application" clause of the

AEDPA, a federal habeas court may only grant the writ where the state court's decision

"identifies the correct governing legal principle from [the Supreme] Court's decisions but

unreasonably applies that principle to the facts of the prisoner's case."  Rodriguez, 439 F.3d at

73 (quoting Williams, 529 U.S. at 413).

**B.**     **Substance of Shaw's Claims**

**1.**     **Ground One**

In his first ground for relief, Shaw argues that he was denied the effective assistance of

appellate counsel.  See Am. Pet., Ground One.

### i.     Clearly Established Supreme Court Precedent

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const., amend. VI.  This Amendment has been interpreted to require that indigents be provided with assigned counsel for their first appeal as of right.  Douglas v. California, 372 U.S. 353, 358 (1963).  Thus, an individual is entitled to the effective assistance of appellate counsel.  McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970).  The proper standard for evaluating a claim which alleges that appellate counsel was ineffective is the test enunciated in Strickland v. Washington, 466 U.S. 668 (1984).  See Smith v. Robbins, 528 U.S. 259, 287-89 (2000).  In Strickland, the Supreme Court held that to establish a violation of one's right to the effective assistance of counsel, a habeas petitioner must show both:  i) that counsel's representation fell below an objective standard of reasonableness, measured in the light of the prevailing professional norms; and ii) resulting prejudice that is, a reasonable probability that, but for counsel's unprofessional performance, the outcome of the proceeding would have been different.  Strickland, 466 U.S. at 688-90.

### ii.     Contrary to, or Unreasonable Application of, Clearly Established Supreme Court Precedent

In support of his first ground for relief, petitioner argues that he was not present at a hearing conducted by the trial court relating to a "juror that was forced to give a guilty verdict against the Petitioner," see Am. Pet., Ground One, and that his appellate counsel's failure to raise that issue on appeal constituted ineffective assistance.  Id.  In his traverse, Shaw argues

that his counsel wrongfully failed to argue on appeal that:  1) his absence from that hearing deprived him of his right to be present during a material stage of his trial; and 2) trial counsel wrongfully withdrew a request that the County Court conduct "a hearing to inquire into the truth" regarding the letters purportedly written by the former juror.  See Traverse at 1-4 (citing CPL § 330.40).[7]  Both of these theories relate to correspondence sent to, inter alia, the County Court by an individual who claimed to have been member of the jury that convicted Shaw.  See Am. Pet., Ground One; see also Traverse.  Therefore, a review of the state court record relating to such correspondence is warranted.

On March 22, 1999, Judge Mulroy presided over a hearing at which Shaw, his trial attorney and the prosecutor were present.  The following exchange occurred at that hearing:

THE COURT: I've received a letter for what it's worth, from somebody that has signed their name, "Unknown," alleging certain improprieties that took place in the jury room during the deliberations of this gentleman's case.  I understand through conversations with Mr. Carey[8] that he's also received a letter and I also understand the Syracuse Newspapers have received a letter.  I assume Mr. Carey is going to ask for some type of an adjournment.[9]   I'll hear you, Mr. Carey.

MR. CAREY: I am, Judge.  Judge, in light of the fact that the Court ... and myself, have received a letter from a person who identifies themselves as a juror in this

_____

[7]        Article 330 of New York's CPL sets for the procedure that must be followed by attorneys who seek to set aside verdict based upon, inter alia, juror misconduct.  See CPL §§ 330.30(2); 330.40(2).

[8]        Shaw's trial attorney was Paul G. Carey, Esq.

[9]        Shaw was scheduled to be sentenced on March 22, 1999.

case, who in my letter states that they were untruthful and they broke their oath, that they did, in fact, have reasonable doubt but they were somehow pressured by the other jurors into rendering a guilty verdict.  This person does say in my letter, and I think in the Court's as well, that, as of now he or she wants to remain unknown, but it says, "I will stay unknown until I find the proper authorities and then I will deal with the consequences at that time."  I would first ask the Court in light of this very serious matter, Judge, to recall the jurors singly, not en masse.  Obviously this person is saying that he or she was coerced by someone or other people in the jury room and I think it's so important that the Judge should – the Court should bring back the entire jury and in-camera interview each one.

THE COURT: Well, first of all, I think any request for the Court to do anything is premature.  I think your request should be in writing so that Mr. Cuffy,[10] can have a chance to respond....  Mr. Cuffy, I'll make my letter available to you for your response.  If you'd like, stop by this afternoon and my secretary will make a copy of it.

MR. CUFFY:  Your Honor, Mr. Carey has provided me with a copy of the letter.

THE COURT: Of my letter?

MR. CUFFY: Oh, excuse me.

MR. CAREY: The letter I received I gave it to him.

MR. CUFFY: I don't know if the Court has a copy of it.

THE COURT: I don't have Mr. Carey's copy.  He doesn't have

---

[10]     Gordon G. Cuffy, Esq. prosecuted the criminal action brought against Shaw on behalf of the State of New York.

my copy and you don't have my copy.....

MR. CUFFY: Okay.

THE COURT: I don't, quite frankly, want anybody's copy.

MR. CAREY: Judge, I'm passing up a copy.

THE COURT: I'll read about it in some motion papers, I'm sure. All right?  Now I'm not going to do anything, Mr. Carey, other than grant you an adjournment for you to formalize your request in writing to me and give Mr. Cuffy a chance to respond.  How long will it take you to put that request down, sir?

MR. CAREY: Judge, I would ask for at least two weeks, because hopefully, whoever this person is will come forward by that time.  I think that would be important if the Court had an opportunity but I'll need at least a couple of weeks to do this, Judge.

MR. CUFFY: Your Honor, could I be heard briefly on this?

THE COURT: Yes, sir.  Yeah.

MR. CUFFY: Basically, the Court's presented with a typed – and it's important that it's typed – a typed letter from someone who signs, "Unknown," and claims to be a juror in this case.  As far as I know, your Honor, I ... may have a different letter as I'm understanding.  I wasn't sent a copy of any letter at all on this case. From what I read in this letter you have a juror say that.  Even if this letter is accepted as being truthful, it doesn't make grounds – it doesn't establish grounds for any change in the outcome of this because the letter basically says that, "I was persuaded by other jurors during jury deliberation," which the Court I know is well aware that's what happens in jury deliberations in every case.  So based prima facie on what I have in front of me, I ask that sentencing go forward

13

because there isn't a ground here to change the
verdict.

THE COURT: I don't disagree with you but I think for fairness
sake and for proper appellate review we ought to
just formalize it in writing.  I don't know how
you're going to make this person who's unknown,
come forward.  I do not intend with this
information to start calling jurors, bringing them
in and beginning an inquiry.  I don't think that's –
this information rises to that level yet.  So that's
just a gut reaction I have to this information, but
I'll give you a chance to put it in writing and
afford this person, if this person is a member of
the jury, to come forward and see what else is
new....

<u>See</u> Transcript of Hearing before Judge Mulroy (3/22/99) (Dkt. No. 26, Exh. J.) ("March, 1999

Tr.") at 3-7.[11]

Approximately three weeks later, on April 14, 1999,  Shaw, his attorney and the

prosecutor appeared before Acting Supreme Court Judge John J. Brunetti.  The transcript of

that  proceeding reflects the following discussion relating to the above-described letters:

THE COURT: This was on today for arguments of motions
relative to some information that came to your
attention - my attention, and I understand the
District Attorney's attention about some letters or
whatnot. Today was the day to make motions
addressed to that.  No motion has been received.  I
intend to sentence this man....

MR. CAREY: Judge, with regards to my motion, my motion was
for the court to conduct an in camera review of
each and every juror particularly with regards to

---

[11]     This Court was not provided with a copy of any of the letters to which the
County Court refers in the March, 1999 hearing.

14

> the letter that was received by numerous people.
> In light of the fact that the District Attorney's
> office has conducted an investigation, and it's my
> understanding that all the jurors were questioned,
> no one stated that they sent that letter, and they
> continued their investigation, I would withdraw
> my motion for the court to do that investigation.

THE COURT: I wasn't going to do it anyway.  Fine, now that I have your
permission not to I'll not do it.

MR. CAREY: You do, judge.

See Transcript of Hearing before Justice Brunetti (4/14/99) (Dkt. No. 26, Exh. K) ("April, 1999

Tr.") at 2-3.

In addressing the merits of Shaw's Coram Nobis Application, the Appellate Division

had the benefit of the above transcripts as well as an affidavit provided by the district attorney

in opposition to Shaw's coram nobis application.  In that affidavit, the district attorney noted

that the investigation into the source of the letters conducted by the district attorney's office

revealed that "the typeface of the letter had been traced back to a typewriter located in the

Justice Center Jail, on the same floor where [Shaw] was being held."  See Affidavit in

Opposition to Shaw's Coram Nobis Application (2/1/02) (Dkt. No. 26, Exh. V) ("February,

2002 Aff.") at 2-3.  That evidence – which was not refuted by Shaw in either the state courts or

this action – is entirely consistent with the district attorney's finding that the above-mentioned

letters were not written by any member of the jury at Shaw's criminal trial.[12]

---

[12]    Petitioner seems to argue that his trial attorney wrongfully failed to conduct
an independent investigation into the source of the letters.  See Traverse at 2.  However,
Shaw has offered nothing short of sheer surmise which suggests that an independent
investigation by the defense counsel would have somehow revealed that the letters were, in

To establish that his appellate counsel's conduct was objectively unreasonable, "'it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made.'"  Clark v. Stinson, 214 F.3d 315, 322 (2d Cir. 2001) (citing Jones v. Barnes, 463 U.S. 745, 754 (1983)); see also Atkins v. Miller, 18 F.Supp.2d 314, 320 (S.D.N.Y. 1998) (citation omitted).  Rather, to prevail upon such this claim, Shaw must demonstrate that his counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Clark, 214 F.3d at 322.  Thus, appellate counsel cannot be considered ineffective for making a strategic decision to abandon weaker arguments and, instead, develop only those arguments more likely to succeed.  See Gonzalez v. Duncan, No. 00-CV-1857, 2001 WL 726985, at *6 (E.D.N.Y. June 22, 2001) (citing Jones, 463 U.S. at 753) ("[a] brief that raises every colorable issue runs the risk of burying good arguments ... in a verbal mound of strong and weak contentions").

Turning to the specific allegations asserted by Shaw in his first ground for relief, the undersigned notes that Shaw initially argues that his counsel wrongfully failed to argue on appeal that the hearing held by the County Court in Shaw's absence regarding the identity of

_____

fact, written by a juror from Shaw's trial.  Unfortunately for petitioner, federal habeas courts cannot grant habeas relief based upon unsubstantiated conclusions, opinions or speculation. See Wood v. Bartholomew, 516 U.S. 1, 8 (1995) (federal courts should not grant "habeas relief on the basis of little more than speculation with slight support"); Huntley v. Superintendent, Supt. of Southport Corr. Facility,  No. 00-CV-191, 2007 WL 319846, at *20 (N.D.N.Y. Jan. 30, 2007) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (citations omitted).  Thus, Shaw is plainly not entitled to habeas intervention merely because his trial attorney failed to independently question the jurors at Shaw's trial as to whether they had written the above-described letters.

16

the author of the letters referenced above violated the principles announced by New York's

Court of Appeals in People v. Antommarchi, 80 N.Y.2d 247 (1992).[13]  See Am. Pet. at

(unnumbered) 7.  However, the transcripts of the hearings referenced above establishes that the

County Court **never conducted** a hearing where factual issues relating to the letters was

explored.  See March, 1999 Tr. at 7 (Judge Mulroy noting that he did not intend to contact

jurors and question them about letters); April, 1999 Tr. at 2-3 (Justice Brunetti noting that he

had no intention of questioning jurors about the above-referenced correspondence).  Therefore,

Shaw's claims that his attorney wrongfully failed to argue on appeal that:  1) the holding of

such a hearing by the trial court in his absence violated his Antommarchi rights (see Am. Pet.,

Ground One; Traverse at 2); and 2) Shaw was wrongfully denied his right to be present at that

hearing (see Traverse at 2-3), are clearly without substance.

Shaw also argues that his appellate counsel rendered ineffective assistance by failing to

argue that petitioner's trial attorney "was not looking out for the petitioner's best interest, nor

was he ... seeking out the truth" when trial counsel withdrew his motion which had requested

that the County Court conduct an investigation into the source of the letters.  See Traverse at 2.

However, this claim appears to overlook the facts that: 1) the district attorney's investigation

into the source of letters revealed that none of the jurors at Shaw's criminal trial had sent such

correspondence (see April, 1999 Tr. at 2-3); 2) the investigation into the source of the letters

---

[13]     In Antommarchi, New York's Court of Appeals held that a criminal
defendant has a right to be present at side-bar conferences held by the trial court with
prospective jurors.  See Figueroa v. Donnelly, No. 02 CIV. 6259, 2003 WL 21146651, at *9
n.5 (S.D.N.Y. May 16, 2003) (citing Antommarchi).

established that they had been created by a typewriter located in the Justice Center Jail at which petitioner was incarcerated (see Coram Nobis Aff. at 2-3); and 3) the County Court specifically declared on the record that it would have denied defense counsel's motion to conduct a hearing into the matter (see April, 1999 Tr. at 3).  The foregoing conclusively demonstrates that appellate counsel did not act unreasonably when he failed to argue on appeal that trial counsel's strategic decision to withdraw the above-described application amounted to ineffective assistance.

Finally, Shaw's argument that appellate counsel improperly failed to argue on appeal that the trial court erred when it did not conduct any hearing relating to the above-mentioned letters fails to recognize the fact that the County Court had determined that no hearing was necessary in light of the facts that were disclosed by the district attorney's investigation relative to the source of the letters.

In sum, the record fails to support Shaw's habeas claim that his appellate counsel rendered ineffective assistance.  Accordingly, he has not demonstrated that the Appellate Division's decision denying his Coram Nobis Application, see Shaw, 292 A.D.2d at 881, is either contrary to, or represents an unreasonable application of, the above-cited Supreme Court precedent.  Therefore, the undersigned denies Shaw's first ground for relief.

## 2.    **Ground Two**

In his second ground, Shaw argues that his conviction was obtained as a result of prosecutorial misconduct.  See Am. Pet., Ground Two.

It is well settled that a federal district court "'may not grant the habeas petition of a

18

state prisoner unless it appears that the applicant has exhausted the remedies available in the courts of the State ....'" Shabazz v. Artuz, 336 F.3d 154,160 (2d Cir. 2003)) (quoting Aparicio v. Artuz, 269 F.3d 78, 89 (2d Cir. 2001) (other citation omitted); see also Ellman v. Davis, 42 F.3d 144, 147 (2d Cir. 1994).  This is because "[s]tate courts, like federal courts, are obliged to enforce federal law."  Galdamez v. Keane, 394 F.3d 68, 72 (2d Cir.) (quoting O'Sullivan v. Boerckel, 526 U.S. 838, 844 (1999)), cert denied sub nom., Galdamez v. Fischer, 544 U.S. 1025 (2005).  As the Supreme Court noted in O'Sullivan, "[c]omity ... dictates that when a prisoner alleges that his continued confinement for a state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief."  O'Sullivan, 526 U.S. at 844; see also Galdamez, 394 F.3d at 72 (quoting O'Sullivan).[14]

Shaw never raised in the state courts – as an independent claim for relief – that his conviction must be reversed because of prosecutorial misconduct.[15]  Rather, Shaw only argued that the prosecutor engaged in misconduct at petitioner's trial as one of the theories Shaw asserted in support of his claim that his appellate counsel rendered ineffective assistance.  See Record at 1747-48; 1757-58.

"Coram nobis applications brought in state court do not exhaust the 'predicate' issues

_____

[14]    This exhaustion requirement "reduces friction between the state and federal court systems by avoiding the unseemliness of a federal district court's overturning a state court conviction without the state courts having had an opportunity to correct the constitutional violation in the first instance."  O'Sullivan 526 U.S. at 845; see also Galdamez, 394 F.3d at 72 (citing O'Sullivan).

[15]    Although Shaw's brief on appeal refers to the conduct that forms the basis of Shaw's second ground for relief, see App. Br. at 37, that brief never alleges that Shaw's conviction should be reversed because of prosecutorial misconduct at Shaw's criminal trial. See App. Br.

raised therein ....” Richards v. Berbary, No. 01CIV.5524, 2003 WL 22076247, at *5 (S.D.N.Y.

Aug. 22, 2003) (citing Turner v. Artuz, 262 F.3d 118, 123 (2d Cir. 2001)); see also Perez v.

Hollins, No. 02CIV.6120, 2004 WL 307271, at *5-7 (S.D.N.Y. Feb. 5, 2004) (claims advanced

in state court only as the predicate for ineffective assistance of appellate counsel claim are not

exhausted for purposes of asserting such claims independent of appellate counsel claim);

Williams v. Bennett, No. 99 CV 1119, 2003 WL 21143070, at *5 n.4 (E.D.N.Y. Jan. 3, 2003)

(same).  Thus, the claim asserted in ground two of Shaw's amended petition, which has never

been asserted by petitioner as independent claim for relief in any state court, is necessarily

unexhausted.

      However, for reasons best known to the respondent, he has not argued that Shaw has

failed to exhaust this (or any) of his claims in the state courts.[16]  Rather, respondent argues this

claim must be denied on the merits.  See Resp. Mem. at 16-17.

      It is improper for a federal district court to sua sponte dismiss a federal habeas claim on

the theory that such claim is unexhausted.  E.g., Acosta v. Artuz, 221 F.3d 117, 121-24 (2d Cir.

2000) (courts may not sua sponte raise nonjurisdictional defenses without affording inmate

"notice and an opportunity to be heard" relative to the proposed dismissal); Klem v. Brunelle,

96-CV-0807, 1999 WL 603824, at *2 n.3 (W.D.N.Y. Aug. 9, 1999) (exhaustion requirement

applicable to habeas petitions is not jurisdictional but rather a principle of comity) (citation

omitted).

--------

[16]    As will be seen, petitioner has also failed to exhaust the claim he asserts in
his fourth ground for relief.

28 U.S.C. § 2254(b)(2) permits federal courts to consider the merits of an unexhausted habeas claim.[17]  The Second Circuit, however, has not yet discussed the standard of review that district courts should employ when reviewing such a claim.  See Brown v. State of New York, 374 F.Supp.2d 314, 318 (W.D.N.Y. 2005).  The majority of courts in this circuit that have addressed this issue have utilized a "patently frivolous" standard.  See Brown, 374 F.Supp.2d at 318 (citing Naranjo v. Filion, No. 02-CIV-5449, 2003 WL 1900867, at *8 (S.D.N.Y. Apr. 16, 2003)) (collecting cases) (footnote omitted).  A minority of district courts have opined that the dismissal of unexhausted claims is appropriate when "'it is perfectly clear that the [petitioner] does not raise even a colorable federal claim.'"  See Hernandez v. Lord, No. 00-CIV-2306, 2000 WL 1010975, at *4 n.8 (S.D.N.Y. July 21, 2000) (collecting cases); see also Edmonson v. Artus, No. 04-CV-5477, 2006 WL 3486769, at *11 (E.D.N.Y. Nov. 30, 2006); Russell v. Ricks, No. 02-CV-0940, 2006 WL 1555468, at *16 (N.D.N.Y. May 31, 2006) (Kahn, J.).  Since the undersigned concludes that Shaw's prosecutorial misconduct claim must be dismissed under either standard, this Court need not determine which of the above-referenced tests should be applied in considering petitioner's unexhausted claims.

A criminal defendant's right to a fair trial is mandated by the Due Process Clause of the United States Constitution.  Albright v. Oliver, 510 U.S. 266, 273 n.6 (1994) (citing United

---

[17]     A federal court may deny – but not grant –  a habeas petition based upon an unexhausted claim.  Aparicio, 269 F.3d at 91 n.5; Cuadrado v. Stinson, 992 F.Supp. 685, 687 (S.D.N.Y. 1998).

States v. Agurs, 427 U.S. 97, 107 (1976)).[18]  For habeas relief to be granted based on a claim of prosecutorial misconduct, however, the alleged misconduct must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)); see, e.g., United States v. Shareef, 190 F.3d 71, 78 (2d Cir. 1999) (internal quotations and citations omitted).  In considering such a claim, courts are to focus on "the fairness of the trial, not the culpability of the prosecutor."  Smith v. Phillips, 455 U.S. 209, 219 (1982).

In support of his claim that his conviction must be set aside due to prosecutorial misconduct, Shaw argues that the prosecutor "knowingly and willingly used fraud and misrepresentation to obtain a conviction against petitioner by putting a false witness on the stand to testify."  Am. Pet. at (unnumbered) 8.  Specifically, Shaw argues that the prosecution "used trickery" when it called Everod Reid as a prosecution witness, and that Reid thereafter provided "false testimony" at Shaw's trial.  Id.  Petitioner contends that "**no** justification ... can make up for the numerous blatant constitutional violations the D.A. bestowed upon the Petitioner," id. (emphasis in original), and that the "fraud and misrepresentation" of the prosecutor deprived Shaw of his right to a fair trial.  Id.

A detailed record relating to Shaw's claim that a "false" witness was purportedly called by the prosecution was generated in the state court proceeding.  Therefore, a review of that record is warranted.

---

[18]      "A right to a fair trial is a right ... protected by the due process clause of the Fourteenth Amendment."  Adamson v. People of State of California, 332 U.S. 46, 53 (1947) (footnote omitted).

Toward the conclusion of its case-in-chief against Shaw, the prosecution called Everod

Reid as a prosecution witness. <u>See</u> Trial Tr. at 895.  The following exchange occurred between

Shaw's counsel, the County Court and the prosecution at the conclusion of that witness's

testimony:

> MR. CAREY: Since discovery ... we have been by way of all the police reports informed an Everod Reid was another person.  We have never been told that Everod Reid, as we had believed by the police reports, was in fact the witness that they just called.  And I think it's improper, given the fact that the prosecutor knew that we had no knowledge that the Everod Reid that we thought was Sardine and the police report said was Sardine was, in fact, not this witness.

> THE COURT: Are you telling –

> MR. CAREY: Which should have been disclosed when that witness list came out, but they never agreed on.

> THE COURT: Are you telling me you've been misl[ed] by the fact that Everod Reid was somebody in the police report or described or some indication of what you thought this man was going to say, who he was, when in fact he takes the witness stand he's been misidentified in those police reports?  As a matter of fact, there is no report  –

> MR. CAREY: During the course of the investigation the name Everod Reid came up as a witness to the homicide. He was identified as Anthony Miller, Sardine, all the police reports we had.  Not until five minutes before this witness took the stand was I informed that the Everod Reid that we had all the police reports was in fact not Sardine, it was someone else.  I believe they have an obligation to tell us if the witness list has someone else on it that we don't know about.

THE COURT: Let me ask you this. Mr. Cuffy, at what point in time did you realize that the Everod Reid discussed and identified in these police reports was, in fact, this individual who fled the area and you had no statement, no reports on.

MR. CUFFY: Well, Your Honor, the Everod Reid who is identified in the police reports is identified as Sardine, so I never thought that was Everod Reid. He was identified as – identified as Oliver Miller, Sardine, and in fact gave a statement at which Sardine identifies himself as Elijah Bey, so there was never any dispute in the police reports that Sardine was not Everod Reid.

THE COURT: The point is, we had a discussion about Everod Reid that apparently the police have had some continual or contact with about this case.

MR. CUFFY: Yes.

THE COURT: ... [M]ay I ask when did you learn about this person?

MR. CUFFY: When I learned there was another Everod Reid, I learned the Everod Reid, I ... learned of [another] Everod Reid in late January.

THE COURT: ... Did you ever tell [defense counsel] that the Everod Reid you talked about in your letter was misidentified in these police reports?

MR. CUFFY: No, Your Honor, I did not.

THE COURT: Did you know that at some point during this preparing, did you know that person was misidentified in those police reports you have?

MR. CUFFY: No, Your Honor, the Everod Reid in the police reports is not misidentified.  The police reports --

24

THE COURT: There's another Everod Reid.

MR. CUFFY:  Yes, it is.

THE COURT: Oh. Oh. I'm sorry.

MR. CUFFY:  The Everod Reid, Sardine uses the name Everod Reid.  He also uses the name Elijah Bey.  And that's clearly in the police reports.

THE COURT: Oh, so the misrepresentation has come from some witness.

MR. CUFFY:  From the witness.

THE COURT: Who says I am Everod Reid.

MR. CUFFY:  Yes. That's my position.

THE COURT: I see. Well, you know, Mr. – I don't know.

MR. CAREY:  Judge, I have a problem with that. There's no indication in here that Everod Reid, and we have consistently seen with all the witnesses the prosecutor has called, they all have several names.

THE COURT: Yeah.

MR. CAREY:  All right? They should have been under [an] obligation, ethical obligation, it's a homicide trial where this man is facing life, should have been under some ethical obligation to at least come back and tell us the Everod Reid that we gave you all these police reports on is not the Everod Reid that we told you about February 3rd, 1999.

\* \* \*

THE COURT: Well, I know. Let me give it some thought. I don't know what sanction, if there was a violation of something, some exculpatory rule.

MR. CAREY: That's what my motion is here today, Judge. My motion is for a mistrial.

THE COURT: Okay. Okay.

MR. CAREY: All right?  Because I believe now, first of all, we're not given the opportunity to prepare for that type of witness, when obviously he's – he's disclosing some time in December of 1998 to his attorney about his involvement and what he saw.  Now ...

THE COURT: Were you informed he was going to come in and make some identification here?

MR. CAREY: No.

THE COURT: That came as a complete surprise.

MR. CAREY: Complete surprise.

THE COURT: When did you know that, Mr. Cuffy?

MR. CUFFY: I knew that. Your Honor. I thought I informed him.

THE COURT: When[?]

MR. CUFFY: I knew that when I spoke to him, when I sent that letter to Mr. Carey.

THE COURT: So in early February, I guess, you knew ....

MR. CUFFY: Well, I did not know he would be able to identify him.  I can't say that.

THE COURT: So when you asked him the question do you see the gunman in the courtroom.

MR. CUFFY: Yeah, I didn't know he was going to identify him. In fact – in fact, as you notice, I didn't ask him that question. He just pointed to the guy.

26

Trial Tr. at 958-64.

The following week, Judge Mulroy ruled on defense counsel's request for a mistrial based upon the foregoing. The County Court opined that the better course for the prosecution to have followed would have been to clearly advise defense counsel, prior to trial, that the Everod Reid to whom the police reports referred was an individual other than the Everod Reid whom the prosecution intended to call as a witness. Trial Tr. at 971-72. However, although the County Court noted that Reid's testimony was "important" for the prosecution, Judge Mulroy nevertheless concluded that such testimony was also "cumulative [of] other witnesses who came in and identified [Shaw] as being the shooter ...." Trial Tr. at 971. The trial court therefore denied the mistrial motion and declined to sua sponte strike Reid's testimony. Trial Tr. at 971.

Initially, this Court finds that the prosecutor did not engage in misconduct with respect to calling Everod Reid as a witness. It is undisputed that before the trial started, the prosecution provided defense counsel with the federal criminal identification record[19] that related to the Everod Reid who took the witness stand. Trial Tr. at 968. The evidence at trial suggested that the rap sheet provided to defense counsel contained all of the aliases of the Reid who testified for the prosecution.[20] See Trial Tr. at 970 (prosecutor noting that federal rap

---

[19]     The federal criminal identification record of an individual is commonly referred to as a "rap sheet."

[20]     For reasons that are not clear to the undersigned, the rap sheet that was provided to counsel regarding Reid is not included in the state court record provided to this Court.

27

sheets contain the aliases of the individuals about whom the rap sheet is created).  Although the Everod Reid whom defense counsel believed would be testifying was also known by the aliases "Sardine" and "Elijah Bey," see Trial Tr. at 960, neither of those aliases appeared on the federal rap sheet that was provided by the prosecutor to defense counsel relating to Reid.  Trial Tr. at 968-69.  Therefore, as the trial court properly noted, the omission on Reid's rap sheet of those known aliases should have caused defense counsel to inquire further about the identity of the Reid who was listed on the prosecution's witness list.[21]  Trial Tr. at 970.  The fact that Reid's rap sheet was provided to defense counsel in advance of the trial severely undermines petitioner's claim that the prosecutor engaged in misconduct through deceit or trickery.

Regardless, it is undisputed that before Reid testified, the prosecution informed Shaw's counsel that the Everod Reid who was about to testify was not the same Everod Reid mentioned in the police reports.  Trial Tr. at 970-71.  Defense counsel never requested a delay in the proceedings upon learning that information, and went on to conduct what the County Court characterized as a "very vigorous cross-examination" of that witness.  Trial Tr. at 971.  During that cross-examination, defense counsel:  i) fully explored Reid's prior criminal history (Trial Tr. at 914-20); ii) established that Reid had violated the terms of his federal probation and was testifying as part of a plea agreement with the United States Attorney relating to that

---

[21]      Defense counsel informed Judge Mulroy that counsel could not recall whether federal rap sheets "provide[] an area for aliases." Trial Tr. at 969-70.  However, federal rap sheets routinely list the aliases of criminal defendants.  E.g., United States v. Rodriguez-Arreola, 313 F.3d 1064, 1067-68 (8th Cir. 2002).  In this Court's experience, federal criminal identification records contain the known aliases of the individual discussed therein.

probation violation (Trial Tr. at 921-23); and iii) elicited testimony from Reid in which he admitted that he had a history of illegally selling guns and had previously been arrested while in possession of at least six pounds of marijuana (Trial Tr. at 923-24).  Significantly, Shaw has failed to articulate how defense counsel's cross-examination of Reid was impacted, in any way, by the claimed misconduct of the prosecution relating to Reid.

"To succeed in a habeas claim based on prosecutorial misconduct, the petitioner must demonstrate 'that he suffered actual prejudice because the prosecutor's [conduct] had a substantial and injurious effect or influence in determining the jury's verdict.'"  Johnson v. State of New York, No. 01 CIV. 4219, 2002 WL 1974048, at *3 (S.D.N.Y. Aug. 26, 2002) (quoting Bentley v. Scully, 41 F.3d 818, 824 (2d Cir. 1994)).  Therefore, even assuming, arguendo, that the prosecutor improperly failed to inform the defense of the fact that the Everod Reid who was to testify at trial was an individual other than the Everod Reid mentioned in the police reports, Shaw's failure to establish that he was prejudiced by the timing of such disclosure is fatal to his prosecutorial misconduct claim.

Finally, in denying defense counsel's motion for a mistrial on the theory of prosecutorial misconduct, Judge Mulroy noted that Reid's testimony was cumulative of the testimony provided by other prosecution witnesses.  Trial Tr. at 971.  After reviewing the trial transcript, this Court endorses that finding of Judge Mulroy.  For example, Ricky Campbell testified that he had observed the fist fight between Johnson and Allen, and that he thereafter observed Shaw shoot Allen.[22]  See Trial Tr. at 597-602.  Campbell's testimony was buttressed

---

[22]    Campbell testified that he was "right there next to" Shaw when he began shooting his gun.  Trial Tr. at 600.

by the testimony of Ameko Brooks, who specifically identified Shaw as the shooter when asked by the prosecutor to identify the person whom he observed holding the gun after Allen was shot.  See Trial Tr. at 848-49.  Additionally, Johnson testified that minutes after the shooting, Shaw admitted that he had shot Allen.  See Trial Tr. at 721-22.  Since Reid's testimony was cumulative of other evidence offered by the prosecution against Shaw, that evidence did not have a substantial and injurious effect or influence in determining the jury's verdict.  E.g., Smith v. Girdich, No. 03-CV-5193, 2004 WL 1743946, at *3 (E.D.N.Y. Aug. 4, 2004) (admission of cumulative testimony did not have substantial and injurious effect or influence in determining the jury's verdict); Richardson v. Artuz, No. 97 CV 2128, 2004 WL 556688, at *21 (E.D.N.Y. Mar. 22, 2004) (admission of perjurious testimony "was merely cumulative, and could not have affected the jury's decision").

In sum, Shaw has failed to demonstrate that the prosecutor engaged in misconduct with respect to the manner in which Everod Reid testified for the prosecution at Shaw's trial. Furthermore, Shaw has wholly failed to establish that he was prejudiced by that conduct in light of the facts that:  1) defense counsel thoroughly cross-examined Reid at trial; and 2) that witness's testimony was merely cumulative of other testimony offered by prosecution witnesses.  Therefore, this unexhausted claim is patently frivolous.  The undersigned alternatively concludes that it is perfectly clear that Shaw has not raised even a colorable claim alleging prosecutorial misconduct at his trial.  Therefore, the second ground in his amended petition must be denied.

30

### C.      Ground Three

Shaw next alleges that his conviction is constitutionally infirm because of the misconduct in which the County Court engaged at Shaw's criminal trial.  See Am. Pet. at (unnumbered) 9.  In support of this claim, Shaw alleges that Judge Mulroy:  i) improperly allowed Everod Reid to testify at Shaw's trial; and ii) was neither fair nor impartial at that proceeding.  See id. at (unnumbered) 9-10.

Shaw raised these claims in his April 2, 2002 CPL motion, see Record at 1806-08, as well as in his April 29, 2002 CPL motion.  See Record at 1856-57, 1873-78.  Those applications were denied by Judge Walsh.  See July, 2002 Order.  This Court must therefore determine whether Judge Walsh's determination is either contrary to, or represents an unreasonable application of, clearly established Supreme Court precedent.

### i.      Clearly Established Supreme Court Precedent

Petitioner's claim that the trial court was biased against him necessarily implicates his right to a fair trial.  See Albright, 510 U.S. at 273 n.6; Agurs, 427 U.S. at 107.  Additionally, the Supreme Court has noted that "the floor established by the Due Process Clause clearly requires a "fair trial in a fair tribunal ... before a judge with no actual bias against the defendant or interest in the outcome of his particular case."  Bracy v. Gramley, 520 U.S. 899, 904-05 (1997).

### ii.      Contrary To, or Unreasonable Application Of, Clearly Established Supreme Court Precedent

Addressing first Shaw's claim that the County Court improperly allowed Reid to testify,

31

this Court finds such claim to be without substance.  Shaw never alleges that he was unaware that the prosecution intended to call Reid as a witness, only that the defense was under the mistaken impression that the Everod Reid who was mentioned in the police reports would testify at trial, rather than a different individual with the same name.[23]  Thus, there was no basis upon which the County Court could have properly precluded Reid's testimony at the subject criminal trial.  Additionally, as noted above, since that witness's testimony was cumulative of that offered by other witnesses at Shaw's trial, this factor weighs against a finding that Reid's testimony deprived Shaw of his right to a fair trial.  E.g., Wray v. Johnson, 202 F.3d 515, 526 (2d Cir. 2000).

Next, although petitioner claims that Reid provided "false and injurious testimony" at Shaw's trial, see Am. Pet. at (unnumbered) 10, the undersigned notes that Shaw provides no support for his claim that Reid's testimony was false.  Rather, this claim appears to invite this Court to find the testimony of that witness to be not credible.  However, the undersigned notes that where evidence was presented from which the jury could have drawn an inference favorable to the accused but it chose not to, courts must "'defer to ... the jury's choice of the competing inferences.'"  Daily v. New York, 388 F.Supp.2d 238, 248 (S.D.N.Y. 2005) (quoting United States v. Kinney, 211 F.3d 13, 18 (2d Cir. 2000) (other citation omitted)); see also Keller v. Bennett, No. 98CV1437, 2002 WL 975306, at *4 (N.D.N.Y. Mar. 21, 2002) (Sharpe, M.J.) ("a habeas court, viewing a cold record, may not properly reassess the jury's

---

[23]     Defense counsel did not object to Reid's testimony until after that witness had completed his testimony.  E.g., Trial Tr. at 958.

finding of credibility concerning the testimony of witnesses offered at trial") (citations omitted), adopted, Keller v. Bennett, No. 98CV1437 (Dkt. No. 18) (N.D.N.Y. Apr. 15, 2002) (Kahn, J.), appeal dismissed, No. 02-2328 (2d Cir. Dec. 12, 2003); Bellezza v. Fischer, 01CV1445, 2003 WL 21854749, at *15 (E.D.N.Y. Aug. 6, 2003) (on collateral review, a federal habeas court "must presume that the jury resolved any questions of credibility in favor of the prosecution") (citing Vera v. Hanslmaier, 928 F.Supp. 278, 284 (S.D.N.Y. 1996)) (other citations and internal quotation omitted); Cottrel v. New York, 259 F.Supp.2d 300, 308 (S.D.N.Y. 2003) (citing Marshall v. Lonberger, 459 U.S. 422, 434 (1983)).  Since there is no evidence before this Court which establishes that Reid's testimony was false or misleading, this unsubstantiated claim does not support a finding that petitioner is entitled to federal habeas intervention.

Finally, as to Shaw's claim that Judge Mulroy was biased against him, see Am. Pet. at (unnumbered) 9-10, the Court notes that mere allegations of judicial bias or prejudice do not state a due process violation.  Brown v. Doe, 2 F.3d 1236, 1248 (2d Cir. 1993) (citing Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 820 (1986)).  Rather, when a judge is claimed by a party to have been biased against him, the entire record must be examined to determine "whether the jurors have been so impressed by the judge's partiality that it affected their deliberations." United States v. Tocco, 135 F.3d 116, 129 (2d Cir. 1998) (citing United States v. Filani, 74 F.3d 378, 385-86 (2d Cir. 1996)).  "To state a due process claim that a judge is biased, the claimant must show either that actual bias existed, or that an appearance of bias created a conclusive presumption of actual bias." Frase v. McCray, No. 01-CV-1704, 2003 WL

25459378, at *1 (N.D.N.Y. July 22, 2003) (citing <u>Phelps v. Hamilton</u>, 122 F.3d 1390, 1323 (10th Cir. 1997)).

In the case <u>sub judice</u>, petitioner cites the fact that Judge Mulroy denied defense counsel's motion for a mistrial and did not strike Reid's testimony as evidence that Judge Mulroy harbored a bias against Shaw.  <u>See</u> Am. Pet. at 9-10.  However, Reid's testimony at Shaw's trial was proper and in no way suggestive of bias on the part of the County Court. Moreover, this Court's review of the trial transcript fails to disclose conduct which indicated improper conduct on the part of the trial court towards Shaw.  To the contrary, the state court record below reveals no conduct on the part of Judge Mulroy that suggests any bias against Shaw.

Since petitioner has failed to demonstrate that the trial court erred in permitting Reid to testify for the prosecution, or that the County Court harbored any bias against Shaw, he has failed to demonstrate that the County Court's July, 2002 Order denying petitioner's CPL motions is either contrary to, or represents an unreasonable application of, the clearly established Supreme Court precedent noted above.  Therefore, the undersigned denies Shaw's third ground for federal habeas relief.

### 4.    <u>Ground Four</u>

In his fourth and final claim, Shaw argues that he received the ineffective assistance of trial counsel.  <u>See</u> Am. Pet. at (unnumbered) 10-11.  In support of this claim, Shaw contends that his trial attorney wrongfully allowed the district attorney "to question juror members out of his presence," and that counsel thereafter wrongfully withdrew his application to question the

34

jurors about the letters that had been sent to, <u>inter alia</u>, the County Court and trial counsel

which suggested that a juror was improperly coerced into finding Shaw guilty of the charges

alleged in the Indictment.  <u>See</u> Am. Pet., Ground Four.

The exhaustion requirement applicable to federal habeas petitions is satisfied where the

habeas claim has been "fairly presented" to the state courts.  <u>See</u> <u>Dorsey v. Kelly</u>, 112 F.3d 50,

52 (2d Cir. 1997) (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275 (1971)).  A claim has been

"fairly presented" when the state courts are apprised of "both the factual and the legal premises

of the claim [the petitioner] asserts in federal court."  <u>Daye v. Attorney Gen'l of N.Y.</u>, 696 F.2d

186, 191 (2d Cir. 1986); <u>Morales v. Miller</u>, 41 F.Supp.2d 364, 374 (E.D.N.Y. 1999).  Where

certain theories in support of an ineffective assistance of counsel claim have been raised in the

state courts and others have not, those theories that have never been asserted in the state courts

are considered unexhausted when raised for the first time in a federal habeas petition.  <u>E.g.</u>

<u>Edmonson</u>, 2006 WL 3486769, at *11-12.

In his appellate brief, counsel argued that Shaw received the ineffective assistance of

trial counsel because counsel's motion to dismiss the Indictment at the close of the

prosecution's proof failed to specify the legal basis for that motion.  <u>See</u> App. Br. at 36-40.

Appellate counsel also argued that trial counsel improperly failed to move for a mistrial upon

learning that "one or more of the People's witnesses had lied to the grand jury."  App. Br. at

37.  However, appellate counsel did not assert either of the theories now raised by petitioner in

his fourth ground for relief in support of counsel's appellate claim which argued that Shaw's

trial counsel rendered ineffective assistance.  <u>See</u> App. Br.  Additionally, as with the claims

raised by Shaw in his second ground for relief, respondent has failed to argue that petitioner is procedurally barred from asserting his unexhausted claims alleging ineffective assistance of trial counsel in this action.  See Resp. Mem. at 12-14.  Thus, the undersigned considers whether Shaw's claim alleging ineffective assistance of trial counsel is patently frivolous or, alternatively, whether it is perfectly clear that Shaw has not raised even a colorable claim alleging ineffective assistance of trial counsel.

As noted above, the Sixth Amendment mandates that criminal defendants be afforded the  assistance of counsel for their defense to the charges against them.  See U.S. Const., amend. VI.  Thus, to prevail on his claim alleging ineffective assistance of trial counsel, Shaw must establish that his trial attorney's representation fell below an objective standard of reasonableness and that petitioner was prejudiced by such deficient representation.  Strickland, 466 U.S. at 688-90; see also Cuevas v. Henderson, 801 F.2d 586, 589-90 (2d Cir. 1986); Simms v. Moscicki, No. 06CIV2056, 2007 WL 162295, at *4 (S.D.N.Y. Jan 19, 2007) (citations omitted); Youngblood v. Brown, 465 F.Supp.2d 270, 282 (S.D.N.Y. 2006) (citations omitted); Anwar v. United States, 648 F.Supp. 820, 826 (N.D.N.Y. 1986) (Munson, C.J.) (citation omitted).

With respect to Shaw's claim that the prosecutor improperly questioned the jurors outside of Shaw's presence, this argument appears to overlook the significant fact that the jury in his criminal trial was discharged from its duties on March 2, 1999, see Trial Tr. at 1209, and that the letters defense counsel and the trial court received alleging improper conduct during the course of deliberations were written some time **after** the jury was disbanded.  E.g. March,

36

1999 Tr. at 2.[24]  Since those individuals had been formally excused from their service as jurors at the time they were questioned by the district attorney, there is no basis upon which this Court may properly conclude that the district attorney wrongfully asked the former members of the jury whether they had written the letters that form the basis of this aspect of Shaw's claim.  In this regard, the Court notes that petitioner has not cited any authority, and this Court's research has disclosed none, which stands for the proposition that defense counsel and/or the defendant himself must be present where the prosecutor questions members of a jury that has been formally excused by a court after the completion of their service on the jury.  Moreover, since the questioning of the jurors occurred **after** the jury had delivered its verdict, it is unclear to the Court how Shaw can properly claim he was prejudiced by the manner in which the jurors were questioned.  Additionally, any claim of prejudice on the part of Shaw is further undermined by the fact that the investigation into the source of the letters ultimately demonstrated that those letters were not written by any of the jurors at Shaw's trial.  See February, 2002 Aff. at 2-3.

As to his final theory in support of this ground, since the County Court specifically declared that it would not grant defense counsel's motion which requested that the trial court individually question the former jurors, see April, 1999 Tr. at 2-3, Shaw cannot demonstrate that he was prejudiced by trial counsel's decision to withdraw his application which requested that relief.[25]  Thus, this final theory in support of his ineffective assistance of trial counsel

---

[24]  The state court record does not reflect the date on which those letters were purportedly written, or when those letters were received by the addressees.

[25]  The post-verdict questioning of jurors by courts is generally disfavored.  See Tanner v. United States, 483 U.S. 107, 120-21 (1987); King v. United States, 576 F.2d 432,

claim is plainly without merit.

Based upon the above, this Court concludes Shaw's unexhausted claim of ineffective assistance of trial counsel is patently frivolous.  The undersigned alternatively finds that it is perfectly clear that Shaw has not raised even a colorable claim with respect to his fourth ground for relief.  Therefore, the final ground in his amended petition must be denied.

### III.   **Certificate of Appealability**

Finally, the Court notes that 28 U.S.C. § 2253(c) provides in relevant part that:

> Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –
>
> > (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court ....[26]

28 U.S.C. § 2253(c)(1)(A).  A Certificate of Appealability may only be issued "if the applicant has made a substantial showing of the denial of a constitutional right."  See 28 U.S.C. § 2253(c)(2).  Since petitioner has failed to make such a showing herein, the Court declines to issue any Certificate of Appealability in this matter.

**WHEREFORE**, after having reviewed the state court record, the documents submitted by the parties in conjunction with this action, the applicable law, and for the reasons discussed herein, it is hereby

---

438 (2d Cir. 1978).

[26]      Rule 22 of the Federal Rules of Appellate Procedure also provides that an appeal may not proceed "unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)."  See Fed.R.App.P. 22(b).

**ORDERED**, that Shaw's amended petition (Dkt. No. 23) is **DENIED** and

**DISMISSED**, and it is further

**ORDERED**, that the Clerk of Court serve a copy of this Memorandum-Decision and

Order upon the parties to this action by regular or electronic mail, and it is further

**ORDERED**, that any state court records that were not filed in this action be returned

directly to the Attorney General at the conclusion of these proceedings (including any appeal of

this Memorandum-Decision and Order filed by any party).

**IT IS SO ORDERED.**

Dated:          March 28, 2007
                Syracuse, New York


_____
Neal P. McCurn
Senior  U.S. District Judge